UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re QUINTELA GROUP, LLC, § | |
| § | |
| Debtor. § | |
| § | CIVIL ACTION NO. 4:20-CV-3499 |
| § | |
| UNITED STATES OF AMERICA, § | |
| § | |
| Appellant. § | |

## MEMORANDUM OPINION AND ORDER

This is a bankruptcy appeal in which the Internal Revenue Service ("IRS") is challenging the bankruptcy court's confirmation of the reorganization plan proposed by the bankruptcy debtor, In re Quintela Group, LLC ("Quintela Group"). The Court **AFFIRMS** the bankruptcy court's judgment.[1]

### I. BACKGROUND

Quintela Group is a small human-resources consulting company that has been in business since 2009. (Dkt. 8 at pp. 173, 228). It is a Texas limited liability company whose sole member is Joel Quintela ("Quintela"), and it provides human resources tests and testing software to its customers that help guide those customers' hiring and

---

[1] Neither the bankruptcy court nor this Court stayed the implementation of Quintela Group's reorganization plan pending this appeal, so this appeal appears to be equitably moot. *See In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994) (setting out the elements of the equitable mootness doctrine). However, Quintela Group has not filed a motion to dismiss, and the Court doubts that the doctrine of equitable mootness can be raised *sua sponte*. *See In re Pacific Lumber*, 584 F.3d 229, 240 (5th Cir. 2009) (explaining that equitable mootness is not jurisdictional Article III mootness but rather is "a kind of appellate abstention that favors the finality of reorganizations"). The Court will accordingly address the merits of the appeal.

promotion decisions. (Dkt. 8 at pp. 173, 228). The company has attracted an impressive clientele—according to Quintela Group's bankruptcy filings and Quintela's testimony, Quintela Group's customer list includes "major universities" and "about 10 Fortune 500" companies—despite a complete reliance on referrals for its business and a failure, for which Quintela has blamed himself, to mount any sort of marketing or sales campaign. (Dkt. 8 at pp. 173, 228, 235, 247).

Though it landed big clients, Quintela Group's profit margins early in its existence were small. (Dkt. 8 at p. 173). The company's profit margins grew as the development and licensing of testing software became a larger part of its business, but "start up debt obligations" still forced it to file for Chapter 11 bankruptcy protection in May of 2020 "to reorganize its financial liabilities." (Dkt. 8 at p. 173). In its Chapter 11 petition, Quintela Group estimated its liabilities at between $1 million and $10 million, including two IRS tax liens totaling nearly $250,000. *See* Southern District of Texas bankruptcy case number 20-32577 at docket entry 1, page 6. Quintela Group estimated the value of its assets at $50,000 or less. *See* Southern District of Texas bankruptcy case number 20-32577 at docket entry 1, page 3. According to a liquidation analysis included with its proposed reorganization plan, Quintela Group estimated that, if the company were liquidated, its unsecured creditors would receive only 5.44% of their claims. (Dkt. 8 at p. 203).

Quintela Group's proposed Chapter 11 reorganization plan promised the company's creditors a much better deal than liquidation. In particular, Quintela Group's plan set out a payment schedule providing its priority unsecured creditors, including the

IRS, payment in full in just under five years. (Dkt. 8 at pp. 183–85). Nevertheless, the IRS objected to the proposed plan on the basis that the plan was not feasible and was based on unrealistic financial projections. (Dkt. 8 at pp. 56–57). No other creditor objected to the plan. (Dkt. 8 at pp. 219–26, 276).

The only witness at the confirmation hearing was Quintela. On direct examination, Quintela testified that Quintela Group's proposed reorganization plan was feasible because the company had found a potentially lucrative new client; had improved its accounting methods and tightened its internal financial controls by hiring a certified public accountant; was adjusting its pricing strategy; was investing more in marketing; had begun working for the first time with the Society for Human Resource Management ("SHRM"), the largest trade group in the human-resources industry; and had signed a contract to begin marketing its products on a featured page in SHRM's online store. (Dkt. 8 at pp. 234–35, 241, 245–46, 265). Quintela further explained that, at the time of the confirmation hearing, Quintela Group and its clients were starting to recover from the worldwide COVID pandemic, which had "hit [Quintela Group and its clients] pretty hard" earlier in 2020. (Dkt. 8 at p. 236). Quintela said that he "could see [his] clients [we]re starting to come back online so the projects [Quintela Group] had in the pipeline [were] coming back[.]" (Dkt. 8 at p. 236).

Quintela testified that Quintela Group had grossed approximately $1.2 million a year for two or three years just before 2020 and had grossed approximately $2 million in 2015. (Dkt. 8 at pp. 242–43). According to Quintela, at the time of the hearing, Quintela Group was on track to gross $700,000 in 2020, which was the least successful year in its

history. (Dkt. 8 at p. 242). Quintela also testified that the reorganization plan's payment scheme was "pretty conservative" because the plan assumed that Quintela Group would earn approximately "$100,000 in revenue" a month, or $1.2 million a year. (Dkt. 8 at p. 240, 250). Quintela added that 2020 was "pretty unique," and he projected that his company would "be back to probably at 1.2 million" in annual gross revenue in 2021. (Dkt. 8 at p. 243).

The mention of revenue projections during Quintela's testimony led to an exchange in which the IRS objected to a line of questioning initiated by the bankruptcy judge. At the beginning of the confirmation hearing, the IRS objected to the admission of Quintela Group's exhibits, including a set of written revenue projections, on the basis that Quintela Group had provided its exhibits to the IRS the day before the hearing instead of two days before the hearing. (Dkt. 8 at pp. 221–22).[2] The basis for the IRS's objection—untimely disclosure—seems a bit questionable as to Quintela Group's written financial projections, considering that the IRS itself had extensively analyzed those same projections in a filing of its own two weeks before the hearing. (Dkt. 8 at pp. 55–63). *See* Southern District of Texas bankruptcy case number 20-32577 at docket entries 53 and 61. In any event, the bankruptcy judge sustained the IRS's objection but explained that he would give Quintela Group "an opportunity to prove [its exhibits] up." (Dkt. 8 at pp.

---

[2] The confirmation hearing was held on October 1, 2020, which was a Thursday. (Dkt. 8 at p. 216). Under Southern District of Texas Bankruptcy Local Rule 9013-2, Quintela Group was required to provide its exhibits to the IRS by noon on September 29, 2020. *See* Southern District of Texas Bankruptcy Local Rule 9013-2, subparts (b) and (m) (providing that, if a hearing falls on a Thursday, exhibits must be exchanged by noon on the previous Tuesday). Quintela Group provided its exhibits at 6:15 p.m. on September 30, 2020. (Dkt. 8 at p. 222).

221–22). When the bankruptcy judge later asked Quintela some general questions about the reliability of Quintela Group's revenue projections, the IRS objected to the bankruptcy judge's line of questioning on the basis that it "[a]ssume[d] facts not in evidence" because "[t]he numbers in the projections [we]re not in evidence[.]" (Dkt. 8 at 241–42). The bankruptcy judge overruled the objection:

> I'm overruling. I'm asking where the numbers came from. What facts did he have? What facts can be in evidence? Just asking where they came from. He can answer that.
> Dkt. 8 at p. 242.

The bankruptcy judge then asked the following question:

> Where are the—where did you get the numbers from in your projections. You were discussing projections. You're saying all this. Tell me where you get the numbers from.
> Dkt. 8 at p. 242.

The bankruptcy judge's question elicited some of the above-summarized testimony from Quintela about Quintela Group's past revenues and projected future revenues. (Dkt. 8 at pp. 242–43). However, neither Quintela nor the bankruptcy judge ever quoted from the excluded documents or read them into the record. (Dkt. 8 at pp. 242–43).

The bankruptcy judge ultimately overruled the IRS's objection to Quintela Group's proposed reorganization plan and confirmed the plan. (Dkt. 8 at p. 276). As the governing statutes required, the bankruptcy judge specifically found that, under "the relatively low parameters articulated in the statute[,]" Quintela Group's proposed plan was feasible. (Dkt. 8 at pp. 282–85). The bankruptcy judge noted that "[n]one of [Quintela Group's] exhibits were admitted" and that his findings were based on

Quintela's testimony. (Dkt. 8 at pp. 276, 285). The bankruptcy judge provided an extensive explanation of his feasibility finding:

> I want to note that the Debtor's managing member testified on a couple of points. The company's been working with an accountant that's vastly improved the company's internal controls and accounting methods. That accounting is also serving—that accountant is also—excuse me—serving as a consultant to make sure the company is accurately accounting for profits/losses and the required payments that would be made under the Plan.
> The Debtor currently provides services to about 10 Fortune 500—10 Fortune 500 companies. To-date the company has really not engaged in marketing efforts but Mr. Quintela testified that they are going to make a strong marketing push for business, and he believes that the company will grow as the economy continues its recovery from the pandemic based on a focused marketing plan.
>
> Evidence of the potential growth is shown with a contract with the Society for Human Resource Management, where the Debtor signed a contract to work with the society on a product that will be marketed to over 100,000 members who could potentially use the Debtor's services. If successful, Mr. Quintela testified that increased profitability could cover as much as two years' worth of Plan payments on just that alone.
>
> I also note that management and current employees will continue to work for the business and the key business growth will not require substantial Capex[3] cost because the nature of the Quintela Group's business, which includes providing digital interview guides and assessment and custom HR technology. In a time where most employees remain working from home, the Court understands that this business may have success in light of the current state of our nation with the global pandemic.
>
> I will also note that I asked Mr. Quintela myself very direct and specific questions about the company's ability to pay claims under the main Plan classes. The uncontroverted testimony is that it can.
> Dkt. 8 at pp. 283–85.

---

[3] "Capex" is an abbreviation for "capital expenditure."

On appeal, the IRS argues that: (1) the bankruptcy judge erred in finding that Quintela Group's proposed reorganization plan was feasible; and (2) the bankruptcy judge erred when it "properly refused to admit Quintela Group's financial projections at trial, but . . . then asked [Quintela] a number of questions about the excluded documents. This demonstrated that the bankruptcy court considered facts outside of the evidentiary record in making its decision." (Dkt. 10 at pp. 4–5, 7, 21).

## II. BANKRUPTCY APPEALS

Federal district courts have jurisdiction to hear appeals from the final judgments of bankruptcy judges. 28 U.S.C. § 158(a). An appeal to a district court from the bankruptcy court "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts[.]" 28 U.S.C. § 158(c)(2). This Court reviews the bankruptcy court's legal conclusions *de novo* but may only disregard a fact finding made by the bankruptcy court if that fact finding is clearly erroneous. *In re Perry*, 345 F.3d 303, 309 (5th Cir. 2003). "A factual finding is not clearly erroneous if it is plausible in the light of the record read as a whole." *In re Ramba, Inc.*, 416 F.3d 394, 402 (5th Cir. 2005). The Fifth Circuit has emphasized that, under the "clearly erroneous" standard, this Court "may [not] weigh the evidence anew" and may only set aside the bankruptcy court's fact findings if it is "left with the definite and firm conviction that a mistake has been committed." *In re Perry*, 345 F.3d at 309 (quotation marks omitted).

## III. FEASIBILITY OF REORGANIZATION PLANS

The IRS first argues that the bankruptcy judge erred in finding that Quintela Group's proposed reorganization plan was feasible. "Whether a plan is feasible is a

question of fact, subject to the clearly erroneous standard on appeal from an order confirming the plan." *In re Investment Company of the Southwest, Inc.*, 341 B.R. 298, 310 (10th Cir. BAP 2006); *see also In re Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1166, 1170 (5th Cir. 1993) (applying clearly erroneous standard and affirming bankruptcy court's finding that reorganization plan was feasible); *Corestates Bank, N.A. v. United Chemical Technologies, Inc.*, 202 B.R. 33, 45 (E.D. Pa. 1996) ("Feasibility is a factual question subject to the clearly erroneous standard of review.").

   —*Legal standard*

To obtain confirmation of a proposed reorganization plan, the plan proponent must, among other things not at issue here, demonstrate to the bankruptcy court by a preponderance of the evidence that the plan meets the feasibility requirement of 11 U.S.C. § 1129(a)(11). *Matter of T-H New Orleans Ltd. Partnership*, 116 F.3d 790, 801 (5th Cir. 1997). Under the statutory standard, a plan is considered feasible if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor[.]" 11 U.S.C. § 1129(a)(11).[4] "The court need not require a guarantee of success[.] Only a reasonable assurance of commercial viability is required." *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 507 (Bankr. S.D. Tex. 1989); *see also In re Star Ambulance Service, LLC*, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015) ("[A] bankruptcy court does not need to know to a certainty, or even a substantial probability, that the plan will succeed."). The feasibility determination "is peculiarly fact

---

[4] A plan may propose future liquidation or reorganization and still be confirmed, 11 U.S.C. § 1129(a)(11), but Quintela Group's plan contains no such proposal.

intensive and requires a case by case analysis, using as a backdrop the relatively low parameters articulated in the statute." *In re Star Ambulance*, 540 B.R. at 266 (quotation marks omitted). "A relatively low threshold of proof will satisfy the feasibility requirement." *Id*. (quotation marks omitted).

Courts have employed the following factors in determining whether a plan is feasible: the debtor's capital structure; the earning power of the business; economic conditions; the ability of debtor's management; the probability of continuation of management; and any other related matter. *In re Geijsel*, 480 B.R. 238, 257 (Bankr. N.D. Tex. 2012). "This is a loose test; a court can weigh (or indeed ignore) various factors at its discretion[, and] courts do not typically 'check off' factors and need not consider all the factors in their decisions." *Id*. At bottom, "[t]he key element of feasibility is whether there exists a reasonable probability that the provisions of the plan of reorganization can be performed." *In re Sagewood Manor Associates Ltd.*, 223 B.R. 756, 762 (Bankr. D. Nev. 1998).

—*The bankruptcy court's feasibility finding was not clearly erroneous.*

The bankruptcy court found that Quintela Group had demonstrated by a preponderance of the evidence that its proposed reorganization plan was feasible. (Dkt. 8 at pp. 283–85). Having reviewed the record and the bankruptcy court's thorough explanation of its reasoning, the Court concludes that the bankruptcy court's finding was not clearly erroneous.

The record shows that Quintela Group sells products for which there is an appreciable demand. Quintela testified at the confirmation hearing that his company had

brought in a significant amount of revenue and amassed an impressive clientele during its 11 years in business without conducting any sort of marketing or sales campaign. (Dkt. 8 at pp. 246–47). According to Quintela, Quintela Group counted 10 Fortune 500 companies among its clients, and it averaged between $1 million and $2 million in annual revenue for at least three of the years between 2015 and 2020. (Dkt. 8 at pp. 173, 228, 242–43). In its least successful year, 2020, Quintela Group was still on track to gross $700,000. (Dkt. 8 at p. 242). Quintela further testified that the COVID pandemic's effect on Quintela Group's business was starting to abate and that "the projects [Quintela Group] had in the pipeline [before the pandemic were] coming back[.]" (Dkt. 8 at p. 236). Quintela added that 2020 was "pretty unique," and he projected that his company would "be back to probably at 1.2 million" in annual gross revenue in 2021. (Dkt. 8 at p. 243).

Since the record indicates that a market exists for Quintela Group's products, the bankruptcy judge, in announcing his findings, focused on additional measures proposed by Quintela Group that would enable the company to tap into that market, promote its products more effectively, and ensure high net profits. The bankruptcy judge specifically mentioned the company's more "focused marketing plan[,]" which included a contract with SHRM, the largest trade group in the human-resources industry, that would enable Quintela Group to offer its services on SHRM's website for the first time. (Dkt. 8 at p. 284). The bankruptcy judge noted that the additional measures proposed by Quintela Group would not require substantial capital expenditures and that "management and current employees w[ould] continue to work for" Quintela Group. (Dkt. 8 at p. 284). The bankruptcy judge also discussed Quintela Group's improved internal policies. Quintela

testified that Quintela Group had improved its internal financial controls and accounting methods by working with a certified public accountant; the bankruptcy judge highlighted and credited that testimony. (Dkt. 8 at pp. 241, 283–84).

The bankruptcy court did not clearly err in finding that Quintela Group's proposed reorganization plan was feasible. Quintela testified that his company had managed to post solid revenues and land 10 Fortune 500 companies as clients solely through referral business, without engaging in any marketing or sales campaigns to speak of. Quintela also testified that he had identified weaknesses in his company's marketing strategy and financial controls and had implemented measures to fix them. The company's past and anticipated revenue performance, combined with the measures implemented by Quintela to improve his company's product promotion and internal financial controls, provide adequate support for the bankruptcy court's finding that there is a reasonable probability that Quintela Group can carry out the requirements of its reorganization plan. *See In re Sea Garden Motel and Apartments*, 195 B.R. 294, 304–07 (D.N.J. 1996) (affirming bankruptcy court's finding that reorganization plan was feasible when "the Bankruptcy Court rejected past performance as the sole reliable criterion of Appellee's future performance, and instead evaluated the changes effectuated by Appellee during the pendency of the bankruptcy and shortly prior to the confirmation hearing"); *In re Gyro-Trac (USA), Inc.*, 441 B.R. 470, 484–86 (Bankr. D.S.C. 2010) ("The data from earlier times, when Debtor sold its own equipment, is a positive indicator of success. . . . Debtor is proposing to eliminate those aspects of its business model that were unsuccessful in order to restructure its processes into a new, streamlined, more successful business

model. Finding that a debtor is not allowed to do this would eliminate much of the usefulness of chapter 11. Chapter 11 is meant to allow struggling businesses to eliminate those aspects of the business that are failing[.]").

### IV. QUINTELA GROUP'S FINANCIAL PROJECTIONS

The IRS next argues that reversal is required because the bankruptcy judge improperly considered a set of written financial projections that Quintela Group had offered as evidence and that the bankruptcy judge had excluded on the basis of untimely disclosure. The Court disagrees.

The record provides no indication that the bankruptcy judge actually relied on the excluded projections to make his fact findings.[5] To the contrary, in announcing his findings, the bankruptcy judge explicitly said that the projections were not in evidence and that he relied solely on Quintela's testimony. (Dkt. 8 at pp. 276–77). Although the bankruptcy judge asked Quintela where the numbers in Quintela Group's projections came from, that question was consistent with the bankruptcy judge's statement at the beginning of the confirmation hearing that he would give Quintela Group "an opportunity

---

[5] In the context provided by the record, it is not clear that the documents needed to be excluded, particularly since "[a] trial judge sitting without a jury is entitled to greater latitude in the admission or exclusion of evidence." *Southern Pacific Transportation Co. v. Chabert*, 973 F.2d 441, 448 (5th Cir. 1992). The financial projections to which the IRS is referring were filed on the bankruptcy court's docket on September 8, 2020, over three weeks before the confirmation hearing. *See* Southern District of Texas bankruptcy case number 20-32577 at docket entry 53. A week later, on September 16, 2020, the IRS discussed the financial projections extensively in a written objection to Quintela Group's proposed reorganization plan. (Dkt. 8 at pp. 55–63). Yet at the confirmation hearing, the IRS objected to admission of the financial projections into evidence on the basis that they had been disclosed as trial exhibits one day before the confirmation hearing instead of two days before the confirmation hearing. (Dkt. 8 at p. 222). No credible argument can be made that the IRS was prejudiced by receiving copies of written financial projections one day late when it had seen and thoroughly analyzed those same projections at least two weeks prior to the disclosure deadline.

to prove [its exhibits] up[,]" and neither Quintela nor the bankruptcy judge ever quoted from the excluded documents or read them into the record. (Dkt. 8 at pp. 221–22, 242–43). The only specific numbers that came into evidence at the confirmation hearing were provided by Quintela himself, who outlined Quintela Group's gross revenue numbers for the years between 2015 and 2019 and gave his estimates of gross revenue for 2020 and 2021. (Dkt. 8 at pp. 173, 228, 242–43). By all indications, the bankruptcy judge based his feasibility findings entirely on Quintela's specific testimony about his company's revenue and the measures that Quintela implemented to remedy his company's deficiencies in the areas of marketing strategy and internal financial controls. (Dkt. 8 at pp. 283–85).

Assuming that the bankruptcy judge improperly considered the excluded financial projections, the Court finds, after reviewing the bankruptcy judge's findings and the rest of the record, that the bankruptcy court would have found Quintela Group's reorganization plan feasible based on Quintela's testimony independent of those projections. Since Quintela's testimony independent of the excluded projections was sufficient on its own to support the bankruptcy judge's finding of feasibility, any improper consideration of those projections by the bankruptcy judge was harmless. *Southern Pacific Transportation Co. v. Chabert*, 973 F.2d 441, 448 (5th Cir. 1992) ("In a bench trial, reversal is only warranted if all of the competent evidence is insufficient to support the judgment, or if it affirmatively appears that the incompetent evidence induced the court to make an essential finding which it otherwise would not have made. We do not find that the challenged evidence was relevant to the trial court's findings regarding the existence and effect of a conventional subrogation. Therefore, even assuming that the

13 / 14

court did err, any error would be harmless.") (footnotes omitted); *see also In re Andre Chreky, Inc.*, 448 B.R. 596, 608–09 (D.D.C. 2011) ("[T]his slight misstep did not affect the outcome of the bankruptcy proceedings. The Court finds that the Bankruptcy Judge would have come to the same conclusion even without relying on this exhibit. Thus, his reliance on the exhibit is harmless error.").

V.     **CONCLUSION**

The record does not support reversal of the bankruptcy judge's feasibility finding. The Court **AFFIRMS** the bankruptcy court's judgment. The Court will issue a separate final judgment.

SIGNED at Houston, Texas, this 20th day of September, 2021.

_____
GEORGE C. HANKS, JR.
UNITED  STATES  DISTRICT  JUDGE